## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 15 2015, 10:06 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

| | |
|---|---|
| **ATTORNEY FOR APPELLANT** | **ATTORNEYS FOR APPELLEE** |
| Megan B. Quirk<br>Muncie, Indiana | Gregory F. Zoeller<br>Indianapolis, Indiana<br><br>Robert J. Henke<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| W.P.,<br>*Appellant-Defendant,*<br><br>v.<br><br>Indiana Department of Child Services,<br>*Appellee-Plaintiff* | October 15, 2015<br><br>Court of Appeals Case No.<br>18A02-1504-JT-230<br><br>Appeal from the Delaware County Court<br><br>The Honorable Kimberly S. Dowling, Judge<br><br>The Honorable Brian Pierce, Magistrate<br><br>Trial Court Cause No.<br>18C02-1407-JT-34 |

**Altice, Judge.**

**Case Summary**

[1] W.P. (Mother) appeals from the involuntary termination of her parental rights to T.S., her minor child (Child).[1] On appeal, Mother argues that the evidence is insufficient to support the juvenile court's judgment.

[2] We affirm.

## Facts & Procedural History

[3] Child was born in March 1999. In November 2011, the Department of Child Services (DCS) was notified that Child had missed thirty-two of fifty-four days of school, twenty-four of which were unexcused. As part of its investigation into the matter, DCS discovered that the residence where Mother and Child lived was "unsanitary and unsafe" due to cat feces on the floor, soiled toilet paper strewn throughout the bathroom, trash scattered throughout the residence, rotten food in the kitchen, a non-working toilet full of feces and urine, and an insect infestation. *Exhibit Volume* at 54. On November 15, 2011, DCS filed a petition alleging Child to be a Child in Need of Services (CHINS) due to Child's school absences and living conditions. Over the course of the next year, Mother successfully completed services, and the juvenile court terminated its jurisdiction over the CHINS matter on November 19, 2012.

[4] Two and a half weeks later, on December 5, 2012, Child was again removed from Mother's care after Child was caught stealing food and hygiene items

---

[1] Child's biological father, B.S. (Father), did not respond to the petition to terminate his parental rights, and therefore, the trial court entered a default judgment thereon. Father does not participate in this appeal.

from a Marsh Supermarket. Mother was with Child at the time of the theft.[2] The State filed a formal delinquency petition on December 21, 2012, after which, Child was released to the custody of foster parents.[3] That same day, the State also filed a petition for parental participation, requesting Mother obtain assistance in fulfilling her obligations as a parent, provide specified care, treatment, and supervision for Child, and work with any person providing care, treatment, or rehabilitation for Child. Child was subsequently adjudicated a delinquent child and she remained out of Mother's care. Following a February 27, 2013 dispositional hearing regarding the theft charge pending against Child, the court issued a dispositional order placing Child on indefinite formal probation, ordering Mother and Child to participate in services while Child remained in foster care, and requiring that a home study be completed with regard to Mother.

On May 8, 2013, Crystal Ivy, a juvenile probation officer assigned to Child, filed a petition for emergency change of placement due to Child's behaviors and disrespectful attitude toward her first foster parents. The trial court granted the request and Child was transferred to the Youth Opportunity Center (YOC). Child was eventually transferred to the YOC Translife Program on May 28, 2013. Probation Officer Ivy noted in her modification report that Child had

---

[2] Mother was also arrested and charged with theft and contributing to the delinquency of a minor. Mother pled guilty to an amended charge of conversion in that cause.

[3] Child was placed in the custody of foster parents following a detention hearing.

advised that she did not wish to return to Mother's care "because she fears she will revert back to her poor behaviors, such as failing to attend school." *Exhibit Volume* at 33.

[6] Probation Officer Ivy filed a review report with the court on August 13, 2013, in which she noted that a home study had not yet been completed because Mother had not provided an address. She further noted that a second foster family was interested in taking Child into their care and custody. The court issued an order following a review hearing and again reiterated its order that Mother provide her address so that a home study could be completed, maintained Child's placement at YOC, and ordered that Child could be considered for placement with Mother or a new foster family in October. At that time, the permanency plan was Child's reunification with Mother. Child was ultimately placed with a second foster family on November 22, 2013.

[7] On January 27, 2014, Probation Officer Ivy filed another review report with the court. She informed the court that Child remained in the care of the second foster family and that minimal problems had been reported. Following a subsequent review hearing in February 2014, the court issued an order continuing Child's placement with her second foster family and ordered Mother "to contact Department of Child Services for a home study if she wishes for the child to return home." *Exhibit Volume* at 46. Probation Officer Ivy's next six-month review report was filed on August 25, 2014. Therein, she informed the court that Child had completed her freshman year of high school and that she was well-adjusted. With regard to Mother, she noted that despite several

attempts, Mother had refused to provide her address and therefore, a home study still had not been conducted. Probation Officer Ivy recommended that the permanency plan for child be changed from reunification with Mother to adoption by her second foster family.

[8] On July 24, 2014, prior to Probation Officer Ivy's August review report being submitted to the court, DCS had filed a petition for the involuntary termination of Mother's parental rights to Child, who was then fifteen years old, and notice was provided to Mother. The court ordered that a CASA[4] be assigned to represent Child's interests. On September 8, 2014, Mother appeared at the initial hearing along with an interpreter[5] and denied the allegations in the petition. The court held a fact-finding hearing on January 30, 2015. On April 13, 2015, the court issued its findings of fact and conclusions, setting forth, in pertinent part, as follows:

> 6. During the course of the delinquency proceeding, [Mother] failed to keep in regular contact with Juvenile Probation Officer Crystal Ivy. [Mother] failed to provide Ivy with a regular address, has not been cooperative about setting up a home study, and has not provided any way for Ivy to keep in contact with her.
>
> 7. [Mother] was ordered to participate in counseling and visitation with the child. While the child was placed at the Youth Opportunity Center, [Mother] . . . visited [Child] only

---

[4] A CASA, or Court Appointed Special Advocate, is an individual who acts as an officer of the court for the purpose of representing the child(ren)'s interests.

[5] Mother is hearing impaired.

twice in a five month period. [Mother] only showed up for half of the scheduled counseling sessions as well.

8. Therapist Lynn Henderson continues to work with [Child]. Initially, Henderson also worked with [M]other. However, [M]other was inconsistent in her participation and got into arguments with [Child] during therapy sessions. Since being placed in foster care, [Child] has been able to make positive progress in therapy.

9. [Child's second foster family has] attempted to get [Mother] to regularly visit with [Child]. However, their efforts have been regularly rebuffed by [Mother]. During the time in which [Child] has been placed with [her second foster family], [Mother] has only made herself available for visitation one time. Additionally, there has not [been] regular phone contact, email contact or regular mail contact with [Child].

10. When originally placed with [her second foster family, Child] struggled with her behavior. She would steal and lie on a regular basis. [Child] put little effort into her school work. Since [Child's] placement with [her second foster family] in November 2013 [until the time of the fact-finding hearing in January 2015], there has been a remarkable turn-around in [Child's] behavior and attitude.

11. With . . . consistent parenting and with Lynn Henderson's work in therapy, [Child] has become a very different child. She no longer regularly lies or steals. She puts forth effort in school and participates in extra-curricular activities.

12. When [Child] was living with [Mother], she received little to no parenting direction. There were often times when there was no food in the house and times when critical utilities were shut off for months at a time. Since being placed with [her second

foster family], [Child] no longer has to worry about such conditions.

13. It is clear through the evidence presented that [Child] has essentially been abandoned by [Mother]. The child's life is much better now that she is in a safe, loving and structured home environment. And it is equally clear why [Child] wants to be adopted by [her second foster family], which is the [foster family's] intent.

14. That the CASA agrees that it is in the best interest of [Child] to terminate the parental rights of [Mother].

15. That based on the foregoing, there is a reasonable probability that the conditions that resulted in [Child's] removal will not be remedied.

16. That based on the foregoing, there is a reasonable probability that the continuation of the parent/child relationship herein poses a threat to the well being of [Child].

17. Termination of the parent/child relationship is in the best interest of [Child].

18. The Delaware County Juvenile Probation Department and The Department of Child Services has a satisfactory plan for the care and treatment of [Child], which is adoption.

*Appellant's Appendix* at 40-41. Based on the foregoing, the court ordered that Mother's parental rights to Child be involuntarily terminated. Mother filed her Notice of Appeal the same day. Additional facts will be provided where necessary.

## Discussion & Decision

[9] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.,* 717 N .E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied.* Thus, if the evidence and inferences support the juvenile court's decision, we must affirm. *Id.*

[10] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.,* 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a juvenile court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.,* 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id*.

[11] Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2).

[12] On appeal, Mother argues that the evidence is not sufficient to support the trial court's judgment involuntarily terminating her parental rights. Specifically, Mother challenges the evidence as it relates to the court's determination regarding I.C. § 31-35-2-4(b)(2)(B)(i) and (ii).[6] Mother asserts that the conditions that resulted in Child's detention have been remedied. Mother

---

[6] Mother does not challenge the court's determination with respect to the other requirements that must be proved by clear and convincing evidence before a court can terminate parental rights. Specifically, Mother does not challenge the court's determination as to I.C. § 31-35-2-4(b)(2)(A)(i-iii), that termination is in Child's best interest, or that there is a satisfactory plan for the care and treatment of Child.

claims that she has moved to a suitable home, maintained a consistent job, and that she is saving money for transportation. Mother also argues that in this case, termination of her parental rights is premature as she has been provided no assistance and there has been no home study to determine her current living conditions. With regard to her relationship with Child, Mother asserts that she "wants to and can care and raise her child" and points out that she successfully completed services resulting in the dismissal of a prior CHINS action. *Appellant's Brief* at 11.

[13] We are sensitive to Mother's plight and fully recognize her stated desire to care for Child. Nevertheless, the clear and convincing evidence presented by DCS and detailed by the court in its judgment terminating Mother's parental rights supports the conclusion that continuation of the parent-child relationship poses a threat to the well-being of Child. In 2011, when DCS first became involved with Mother, Child, who was twelve years old at the time, had missed an extraordinary amount of school. Child was the primary caretaker for her younger sibling and would get her younger sibling ready and off to school, but would then not go herself. Child explained that she felt obligated to care for Mother. Child described the conditions of the home at that time as "[h]orrible," with trash everywhere, mold, cat feces, and gnats. *Transcript* at 31. After a CHINS petition was filed, Mother apparently cooperated with services and the CHINS petition was dismissed a year after it was filed. Child testified that the house remained clean and appropriate for about two weeks.

[14]    In December 2012, less than three weeks after the CHINS petition was dismissed, Child attempted to steal food and hygiene items at Mother's direction. Mother and Child were arrested, and Child was detained. Over the course of the next twenty months, Child was placed in two different foster homes and spent several months at the YOC. Child received counseling to deal with adjustment issues, bipolar disorder, and behavioral concerns. Mother was ordered to participate in the counseling as well, and did attend a few counseling sessions, but was never consistent with her participation and had not participated in the months leading up to the filing of the termination petition. Mother visited Child on occasion while Child was placed at the YOC and only one other occasion when Child was placed with a foster family. On that occasion, Mother had the foster family bring Child to her place of employment because she did not want Child to come to her home. Mother has had very minimal contact with Child via email, regular mail, and social media. Child testified that she would contact Mother via social media and Mother would respond sporadically and that "usually [Mother] doesn't contact me unless she wants something from me." *Id*. at 34.

[15]    Child testified that "[w]hen I was with my mom I never thought I'd make it to like 20." *Id*. at 28. Child elaborated when questioned by the court that when in Mother's care, she never thought about her future or that she even had a future. Child further described for the court that when in Mother's care, there was no food to eat, so they would go to food pantries or steal food. Mother also did

not pay bills, so essential utilities like water and electricity were always being turned off.

[16] Child told a different story when describing her life with her foster family. Child told the court that she liked knowing that she had a future. Child was regularly attending school and making significant improvements in her academics and with her behavior. Child was involved in extra-curricular activities and was fully supported by her foster parents, who now wish to adopt her. Child's counselor at the YOC testified that things had really changed since Child was placed in foster care in that she was "actually doing teenage things" and was "no longer being a parent." *Id.* at 10, 11. Child expressed her fear that if placed back with Mother she will have to be the parent again and will be back in the same position she was in prior to being removed from Mother's care for the second time. Child informed the court that she did not want to hurt Mother, but expressed her desire to be adopted by her current foster family.

[17] The record belies Mother's claim that she was not offered services to help in seeking reunification with Child. Mother was permitted to visit child and ordered to participate in counseling, but did so only sporadically. Mother made no attempt to regularly communicate with Child. With regard to a home study, Mother failed and/or refused to provide Probation Officer Ivy with her address or keep her apprised of new addresses after she moved. Even after Probation Officer Ivy had an address for Mother, Mother did not cooperate in getting a home study completed. Mother's actions demonstrate a definite indifference toward reunification with Child. We agree with the court that the evidence

presented shows that Child "has essentially been abandoned by her mother."
*Appellant's Appendix* at 41.

[18] Based on the foregoing, we conclude that DCS presented clear and convincing evidence that there was a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home would not be remedied and that continuation of the parent-child relationship posed a threat to the well-being of Child. Mother's claims to the contrary are simply requests that this court reweigh the evidence, which we will not do.

[19] Judgment affirmed.

[20] Riley, J., and Brown, J., concur.